**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-1972**

PHILIP E. PARKER, SR.; MELISSA RODRIGUEZ, individually and
as a personal representative of the Estate of Philip E.
Parker, Jr., deceased,

Plaintiffs - Appellants,

v.

STATE OF MARYLAND; MARY ANN SAAR, Secretary, Department of
Public Safety & Correctional Services; FRANK C. SIZER, JR.,
Commissioner, Division of Corrections; LEHRMAN DOTSON,
Warden, Maryland Correctional Adjustment Center; OFFICER
#1, Escorting Kevin G. Johns to sentencing; OFFICER #2,
Supervisor in charge of Transportation at the Maryland
Correctional Institution Hagerstown; OFFICER #3, Officer or
Officers who placed men on transportation vehicle at the
Maryland Correctional Institution Hagerstown to Maryland
Correctional Adjustment Center; ROBERT SCOTT, an Officer on
Transport Vehicle; KENYATTA SURGEON, an Officer on
transport vehicle; LARRY COOPER, an Officer on transport
vehicle; EARL GENERETTE, an officer on transport vehicle;
CHARLES GAITHER, driver of transport vehicle; OFFICER
NUMBER 9, Officer at the Maryland Correctional Adjustment
Center, Supervisor in charge of receiving inmates being
transported from the Maryland Correctional Institution
Hagerstown; OFFICER NUMBER 10, Officer or Officers at the
Adjustment Center, Officers receiving inmates being
transported from the Maryland Correctional Institution
Hagerstown,

Defendants - Appellees.

Appeal from the United States District Court for the District of
Maryland, at Baltimore. Andre M. Davis, District Judge. (1:06-
cv-01676-AMD)

Argued:  December 8, 2010          Decided:  January 21, 2011

---

Before Sandra Day O'CONNOR, Associate Justice (Retired), Supreme Court of the United States, sitting by designation, and DUNCAN and AGEE, Circuit Judges.

---

Affirmed by unpublished opinion.  Judge Duncan wrote the opinion, in which Associate Justice O'Connor and Judge Agee joined.

---

**ARGUED:** Michael A. Mastracci, LAW OFFICE OF MICHAEL A. MASTRACCI, LLC, Baltimore, Maryland; Samuel Martin Shapiro, SAMUEL M. SHAPIRO, PA, Rockville, Maryland, for Appellants.  Rex Schultz Gordon, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.  **ON BRIEF:** Douglas F. Gansler, Attorney General of Maryland, Stephanie Lane-Weber, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

This appeal arises out of Maryland inmate Kevin Johns's murder of a fellow prisoner, Philip Parker, Jr. Plaintiffs are Parker's mother and father, who sued various correctional officers, prison officials, and the State of Maryland, alleging, inter alia, a violation of Parker's Eighth Amendment rights under 18 U.S.C. § 1983. The district court granted summary judgment for defendants. Plaintiffs urge that the court erred by finding that their claims failed as a matter of law. For the reasons described below, we affirm.

I.

A.

We review the relevant facts, construing the evidence in the light most favorable to plaintiffs and drawing all reasonable inferences in their favor. Smith v. Ozmint, 578 F.3d 246, 250 (4th Cir. 2009).

Parker and Johns were inmates in Baltimore, Maryland's high-security "Supermax" prison. On January 31, 2005, Parker, Johns, and two other Supermax inmates were transported by bus to a correctional facility in Hagerstown. While in Hagerstown, Parker testified at a sentencing hearing for Johns. Parker explained that he had known Johns for "[t]hree or four years" and liked him personally. J.A. 102-03. He added, however, that

3

he believed that Johns needed treatment while incarcerated to deal with paranoia and anger issues.

In the early morning of February 2, 2005, a bus operated by the Maryland Division of Correction picked up the four Supermax inmates, as well as thirty-two other prisoners from several Hagerstown facilities, for transportation back to Baltimore. The bus was staffed by five correctional officers: Sergeant Cooper and Officers Gaither, Generette, Scott, and Surgeon. All of the officers were armed with firearms and pepper spray.

The officers strip-searched the four Supermax inmates before permitting them to board the bus. They also placed the prisoners in three-point restraints. Officers Gaither, Generette, Scott, and Surgeon observed the Supermax inmates laughing, joking, and apparently on friendly terms with each other as they took their seats at the rear of the bus. Johns sat one row behind Parker.

During transport, most of the thirty-six inmates were seated in three interior compartments, divided by grillwork and locked doors. One inmate had, at his request, been placed in a protective custody cage for the trip, after receiving death threats from Johns. Parker had not reported any such threats, nor were any of the officers otherwise aware of any tension or conflict between Parker and Johns.

4

Officers Generette and Surgeon rode at the front of the bus, next to Officer Gaither, who was driving. Sergeant Cooper and Officer Scott rode in a compartment at the back of the vehicle, about seven feet behind Parker's seat, which was in the rearmost inmate compartment. A layer of plexiglass and grillwork separated Sergeant Cooper and Officer Scott from that compartment.

The bus's interior lights were turned off for most of the ride. While the bus was in transit, an inmate observed Officer Surgeon playing games on her cell phone. Another inmate witnessed an officer at the rear of the bus watching a portable television set.

Around 3:45 a.m., Officer Scott saw a then-unidentified inmate at the rear of the bus get up from his seat and move to the seat in front of him. Officer Scott used the bus's interior telephone to report what he had seen to the officers at the front of the bus. He explained that "he did not know whether the inmate was playing or not" but "thought [that] something had happened." Id. at 123. At his request, the bus's interior lights were turned on.

Sergeant Cooper shone his flashlight through the plexiglass and grillwork in the direction of the inmate who had switched seats--now identified as Johns. Johns had moved to sit on the same bench as Parker. Officer Scott could see a blue shirt in

5

the corner of the seat by the window. Officer Scott knew that the blue shirt did not belong to Johns, who had been wearing a white T-shirt when he boarded the bus. He told the other officers that when they reached their first stop, the Supermax prison, they should "go back to the back of the bus as a team," as he was not sure "if the inmates were planning to try to do something to an officer." Id. at 280. For his part, Sergeant Cooper "saw nothing unusual." Id. at 236.

From the front of the bus, Officer Generette could see the heads of the inmates in the rear compartment and observed "nothing unusual or out of the ordinary." Id. at 123. He saw Johns in particular "look[ing] calm and relaxed, with his head laid back on the seat[] looking at the ceiling." Id. Officer Generette informed Officer Scott that nothing seemed wrong. The officers turned off the interior lights and the bus proceeded to the Supermax prison.

Upon arrival, Officer Scott "[j]umped out" of the bus and "[r]an around front." Id. at 282. The officers stowed their weapons in the vehicle's weapon box and Officer Gaither unlocked the rear compartment, where Johns's movement had earlier been observed. Officer Gaither called each inmate out individually. The first two Supermax inmates emerged without incident. Sergeant Cooper escorted them into the prison.

Johns was the third inmate called from his seat. He had "red marks on his shirt" that "looked like blood." Id. at 285. Officer Scott also saw blood on the seat where Johns had been sitting. Officer Scott told Officer Gaither to hold Johns and reported that Johns may have "cut" Parker. Id. Officer Scott then moved to Parker's seat and found Parker "slumped down in between the chairs." Id. Officer Scott shook Parker and called out to him, but Parker did not respond. Officer Scott raised Parker's head, revealing "a mark on his neck" and "some blood by his nose." Id.

Officer Scott attempted to lift Parker but was unable to do so, since Parker's leg was twisted under the seat. Officer Scott enlisted the help of Officer Gaither. While the two worked to extricate Parker, Sergeant Cooper returned from escorting the first two Supermax inmates into the prison. Sergeant Cooper asked if medical assistance was required and Officer Gaither replied that it was. Sergeant Cooper returned to the prison "and advised them to contact medical services or call 911 because an inmate on the bus was injured." Id. at 236.

In the meantime, Officers Scott and Gaither removed Parker's restraints and lifted him from his seat. The officers

7

carried Parker to the front of the bus.[1]  Several minutes later,

they removed him from the bus and laid him down in the

Supermax's sallyport.

While Parker was laid out in the sallyport, officers

repeatedly checked his pulse and verbally confirmed that he had

one.[2]  An officer shone a flashlight into Parker's eyes in an

attempt to gauge his responsiveness.  Another officer requested

a sheet or blanket for Parker but neither was produced.  After a

few minutes in the sallyport, two officers carried Parker

inside.  At around 4:22 a.m., emergency medical personnel

arrived and began treating Parker.  Parker was taken to

Baltimore's Mercy Hospital, where he was pronounced dead at

4:57 a.m.  Parker's autopsy showed that he died of

strangulation.

A subsequent investigation revealed that Johns had loosened

his restraints during transport.  While still seated behind

---

[1] The district court found that Officer Gaither performed CPR on Parker at the front of the bus.  Rodriguez v. Maryland, Civ. No. AMD 06-1676, at 5 (D. Md. July 31, 2008).  Although there is testimony from the officers that Officer Gaither did so, their account was disputed by an inmate, who testified that no CPR was performed.  Consistent with our obligation to construe disputed facts in the light most favorable to the plaintiffs, we assume that no CPR was performed.

[2] The record includes a video depicting a portion of the events that took place at the Supermax facility.  It is not clear how long the bus had been at the prison when recording commenced.

Parker, Johns hooked his arm over the seat and choked Parker for about five minutes, until he stopped moving. Johns then stood up, moved forward, and sat down next to Parker. Placing Parker's head in his lap, Johns made statements like "[t]his is your last ride mother fucker" and "go to sleep little baby" and cut Parker with a razor blade. Id. at 741. Although at least two inmates witnessed the murder, none of the prisoners alerted the correctional officers that Parker was being attacked.

B.

Plaintiffs filed suit in Maryland state court in May 2006, alleging violations of Parker's federal constitutional rights under the Eighth and Fourteenth Amendments as well as various state law claims. Defendants removed the case to federal district court on June 29, 2006. On February 8, 2008, defendants filed a motion to dismiss or, in the alternative, for summary judgment.

The district court granted defendants' motion for summary judgment on July 31, 2008. In a ten-page memorandum opinion, the court concluded that neither the officers' failure to protect Parker from Johns's attack nor their limited treatment of Parker's injuries rose to the level of an Eighth Amendment violation. Rodriguez v. Maryland, Civ. No. AMD 06-1676, at 1-2 (D. Md. July 31, 2008). As a result, the district court dismissed plaintiffs' federal claim and remanded their suit to

9

state court so that they could proceed on their state law claims. Id. at 10. This appeal followed.

## II.

We review the district court's grant of summary judgment de novo and affirm only if there is no genuine issue of material fact and defendants are entitled to judgment as a matter of law. Robinson v. Clipse, 602 F.3d 605, 607 (4th Cir. 2010). Plaintiffs argue that the district court ignored facts which support their claim that the officers violated Parker's Eighth Amendment rights by failing to protect him from Johns and by inadequately attending to his injuries.[3] We disagree. While we are not unsympathetic to the tragic circumstances of Parker's murder, plaintiffs' arguments sound in negligence and do not meet the high bar for Eighth Amendment claims.

## A.

We first address plaintiffs' assertion that the officers' failure to protect Parker from Johns violated the Eighth Amendment's proscription of cruel and unusual punishment. To prevail on an Eighth Amendment claim, a plaintiff must show that

---

[3] We need not reach plaintiffs' argument concerning the admissibility of certain evidence, including unsworn hearsay statements. Appellants' Br. at 24-27. Even if we were to admit the disputed materials, they would not defeat summary judgment.

10

(1) the inmate was objectively denied "the minimal civilized measure of life's necessities" and (2) the officers had a "sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (internal quotations omitted). For purposes of a claim that officers failed to prevent harm, the objective portion of the test is met by a showing that the inmate was "incarcerated under conditions posing a substantial risk of serious harm." Id. Since Parker was murdered while in custody, the first part of the test is clearly satisfied. As a result, plaintiffs' claim turns on defendants' state of mind.

The requisite state of mind for an Eighth Amendment challenge "is one of deliberate indifference to inmate health or safety." Odom v. S.C. Dep't. of Corr., 349 F.3d 765, 770 (4th Cir. 2003) (internal quotations omitted). A correctional officer is deliberately indifferent if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837; see also Rich v. Bruce, 129 F.3d 336, 340 (4th Cir. 1997). This subjective assessment "sets a particularly high bar to recovery," Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008), which cannot be met by "a showing of mere negligence," Young v. City of Mt. Ranier, 238 F.3d 567, 575 (4th Cir. 2001).

11

Plaintiffs are correct that the summary judgment record paints a troubling portrait of the officers' activities before, during, and immediately after the attack. Inmate testimony shows that some of the officers were distracted during transit and insufficiently attentive to the prisoners in their charge. It is also undisputed that Sergeant Cooper and Officer Scott failed to notice or intervene during the attack, which occurred just seven feet from where they were sitting. Further, none of the officers tried to prevent Johns from switching seats during transit or detected the razor blade he used to cut Parker. The officers' shortcomings, however, do not go to the ultimate issue before us. Absent some awareness of a "substantial risk of serious harm," Farmer, 511 U.S. at 837, the officers' behavior does not rise to the level of deliberate indifference.

Plaintiffs have identified no evidence that the officers in fact perceived such a risk before the attack. Plaintiffs do not dispute that the officers received no notification of any conflict between Johns and Parker prior to transport and cite nothing in the record to suggest the officers were otherwise aware that Johns posed a threat to Parker. To the extent that the officers failed to independently access available information about Johns's criminal history, their omission was, at most, negligent.

Given the officers' lack of prior warning, plaintiffs must show that the officers witnessed the attack and nonetheless were deliberately indifferent to the risk it presented. Plaintiffs cite five pieces of evidence on this essential point: (1) Officer Generette's testimony that when the lights were turned on he could see Johns's head from the front of the bus, which plaintiffs argue supports an inference that Sergeant Cooper and Officer Scott could see more than they claimed; (2) an inmate's statement that, while seated at the front of the bus during transit, he "heard moaning sounds . . . coming from the rear," J.A. 739; (3) another inmate's testimony that he witnessed the murder from "about 6 feet" away and "clearly heard Parker making gagging and gasping sounds" as well as Johns making menacing statements, J.A. 740-41; (4) an inmate's claim that Sergeant Cooper shone his flashlight directly on the blood on the back of Parker's seat shortly after the attack; and (5) a video walk-through of the bus during discovery that, plaintiffs contend, showed it was possible to see the attack from the officers' rear compartment.

None of the evidence on which plaintiffs rely is inconsistent with the officers' assertion that they did not witness the attack. Even allowing for a jury's unique capacity to weigh evidence and assess credibility, see, e.g., Holland v. Wash. Homes, Inc., 487 F.3d 208, 213 (4th Cir. 2007), the fact

13

that officers <u>could have seen</u> the attack is insufficient to support the inference that they <u>actually witnessed</u> it.  As plaintiffs' counsel conceded at oral argument, there is no evidence that any officers saw the blood on Parker's seat or otherwise knew of the attack until after the bus had arrived at the Supermax prison.  Plaintiffs' arguments to the contrary amount to "mere speculation," which cannot "create a genuine issue of material fact."  <u>Emmett v. Johnson</u>, 532 F.3d 291, 297 (4th Cir. 2008) (quoting <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985)).

Plaintiffs' reliance on <u>Odom</u> highlights the weakness of their claim.  In <u>Odom</u>, the defendant officers received an explicit warning that Odom's attackers were "going to try and kill [him]."  349 F.3d at 767.  They then stood by and watched as inmates began to demolish the recreational cage separating them from Odom.  <u>Id.</u>  Perhaps most importantly, whereas the officers in <u>Odom</u> "fail[ed] to offer any evidence in support of any . . . justification for their actions," <u>id.</u> at 772; <u>see also</u> <u>id.</u> at 770 n.2, the officers here have presented an explanation for their failure to intervene on Parker's behalf: they were unaware of the attack.[4]

---

[4] <u>Burks v. Pate</u>, 119 F. App'x 447 (4th Cir. 2005) (unpublished disposition), is similarly distinguishable.  In <u>Burks</u>, the plaintiff presented photographic evidence and an (Continued)

14

The officers' failure to prevent Parker's murder may have been negligent. But negligence does not constitute an Eighth Amendment violation. Young, 238 F.3d at 575. Absent evidence that any of the officers possessed a sufficiently culpable state of mind, plaintiffs' failure-to-prevent-harm claim cannot surmount the Eighth Amendment's "high bar to recovery." Iko, 535 F.3d at 241.

B.

Plaintiffs next argue that the officers were deliberately indifferent to Parker's ultimately fatal injuries after they discovered him unconscious on the bus. Parker's "serious medical condition" satisfies the objective prong of the Eighth Amendment inquiry. Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). Plaintiffs' claim again turns on whether the officers were deliberately indifferent to his injuries. In order to prove deliberate indifference, plaintiffs must show that defendants "actually knew of and ignored [Parker's] serious need for medical care." Young, 238 F.3d at 575-76; see also Smith v. Smith, 589 F.3d 736, 738 (4th Cir. 2009) (noting that prison guards can manifest deliberate indifference, inter alia,

---

affidavit that "created a genuine issue of material fact-- whether or not [the officer] actually saw the attack." Id. at 450. The affidavit specifically stated that the officer "was standing and looking up at the assault." Id. at 449.

by "intentionally denying or delaying access to medical care") (quoting Estelle v. Gamble, 429 U.S. 97, 104-05 (1976)). On these facts, plaintiffs cannot do so.

Plaintiffs focus their claim on the officers' failure to perform CPR or provide other medical assistance during the interval between when they carried Parker off the bus and when emergency personnel arrived. They rely heavily on a video that shows roughly five minutes of this period, during which plaintiffs argue the officers "did absolutely nothing to assist the unresponsive Phillip Parker." Appellants' Br. at 32. Plaintiffs' argument is unpersuasive.

As a threshold matter, plaintiffs ignore the officers' undisputed actions in the minutes before video recording began. After discovering Parker unconscious on the bus, Officer Gaither instructed Sergeant Cooper to contact medical services. While emergency personnel were being summoned, Officers Gaither and Scott worked together to free Parker from his restraints, extricate him from his seat, and move him off the bus. Contacting medical services and removing Parker from his seat are inconsistent with deliberate indifference. Cf. Iko, 535 F.3d at 243 (finding that the failure to "seek[] any medical evaluation or even decontamination" after an inmate collapsed due to pepper spray constituted medical deliberate indifference).

16

Further, plaintiffs' lurid description of the events depicted on video is misleading. At the outset of the video, a correctional officer states that emergency personnel are en route. In the intervening minutes, as shown on the recording, correctional officers sought a sheet or blanket for Parker, shone a light in his eyes to gauge his responsiveness, and repeatedly took his pulse. In other words, the video does not support plaintiffs' claim that the officers ignored Parker's condition.

It is certainly probable that there are things the officers could or should have done after discovering Parker's condition. But once again, plaintiffs' recitation of actions not taken sounds entirely in negligence. On the undisputed facts, the officers' attention to Parker's condition, though limited, was sufficient to preclude a finding of deliberate indifference.[5]

---

[5] Plaintiffs' failure to show that the officers inflicted a constitutional injury necessarily bars any finding of supervisory liability for the non-officer defendants. See Tigrett v. Rector & Visitors of Univ. of Va., 290 F.3d 620, 630-31 (4th Cir. 2002); see also Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994).

17

III.

For the foregoing reasons we affirm the grant of summary judgment.

AFFIRMED