*Melissa Rodriguez, et al. v. Larry Cooper, et al.,* No. 27, September Term 2017. Opinion by McDonald, J.


**TORTS – CAP ON NONECONOMIC DAMAGES**

A Maryland statute limits awards of noneconomic damages – such as mental anguish, pain and suffering, and loss of consortium and companionship – in personal injury and wrongful death actions according to a formula set forth in the statute. Even if a defendant has the ability to "waive" the operation of that statute, there was no waiver under the facts of this case. The statute is not limited to personal injury or wrongful death actions based on negligence. Nor are actions against the State or State personnel exempted from the statute. Maryland Code, Courts & Judicial Proceedings Article, §11-108.


**SOVEREIGN IMMUNITY – MARYLAND TORT CLAIMS ACT – REPRESENTATION OF STATE PERSONNEL IN TORT ACTIONS**

In the Maryland Tort Claims Act, the General Assembly has made a limited waiver of the State's sovereign immunity allowing persons injured by the negligent actions or omissions of State personnel within the scope of their public duties to recover a judgment against the State while immunizing those State personnel from liability. The General Assembly has not waived the State's sovereign immunity – and not immunized State personnel – if the State personnel acted with malice or gross negligence. The General Assembly has also authorized the Attorney General to represent State personnel named as defendants in tort actions and specifically provided that such representation does not waive the State's sovereign immunity. The representation of a State employee who was found to be grossly negligent by the jury at the trial of this case did not effect a waiver of the State's sovereign immunity. Maryland Code, State Government Article, §§12-101 *et seq.*, 12-301 *et seq.*; Courts & Judicial Proceedings Article, §5-522.

Circuit Court for Baltimore City
Case No. 24-C-06-004331
Argument:  December 5, 2017

IN THE COURT OF APPEALS
OF MARYLAND

No. 27

September Term, 2017

_____

MELISSA RODRIGUEZ, ET AL.

V.

LARRY COOPER, ET AL.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Getty
Harrell, Glenn T., Jr.,
        (Senior Judge,
           Specially Assigned),

JJ.

_____

Opinion by McDonald, J.
_____

Filed: April 12, 2018

The doctrine of sovereign immunity, "[g]rounded in ancient common law, … bars individuals from bringing actions against the State, thus protecting it from interference with governmental functions and preserving its control over its agencies and funds."[1]  Under that doctrine, the State and its agencies may not be sued for a money judgment unless the Legislature has waived that immunity and enabled State agencies to obtain the funds necessary to satisfy such a judgment.[2]  In the Maryland Tort Claims Act ("MTCA"),[3] the General Assembly has done so with respect to the negligent actions or omissions of State personnel within the scope of their public duties.  Pertinent to this case, that waiver of sovereign immunity has two key provisos:  (1) the waiver does *not* extend to actions or omissions of State personnel that are grossly negligent; and (2) a judgment against the State is capped at an amount set by statute.

Separately, without specific reference to actions against the State or State personnel, the Legislature has also established a cap on noneconomic damages in all personal injury and wrongful death actions.  Maryland Code, Courts & Judicial Proceedings Article ("CJ"), §11-108.  Noneconomic damages include, for example, damages for mental anguish, pain and suffering, and loss of companionship or consortium.  That cap is calculated according to a statutory formula based on when the cause of action arose and the number of claimants.

---

[1] *Condon v. State*, 332 Md. 481, 492 (1993).

[2] *Id.*

[3] Maryland Code, State Government Article, §12-101 *et seq*.; Maryland Code, Courts & Judicial Proceedings Article, §5-522.

This case arises out of the murder of a State prisoner, Philip E. Parker, Jr., by a fellow prisoner while they were both in State custody on a prison transport bus. Mr. Parker's estate and parents (Melissa Rodriguez and Philip E. Parker, Sr.) – the Petitioners in this appeal – brought suit against the State and various State officials and employees in the Circuit Court for Baltimore City. After a jury trial, and various post-trial and appellate proceedings, they obtained a judgment against the State, based on the jury's finding that certain correctional officers were negligent, and a judgment against one correctional officer, Respondent Sgt. Larry Cooper, based on the jury's finding that he was grossly negligent. The Circuit Court limited the judgment against the State pursuant to the statutory cap under the MTCA, and limited the judgment against Sgt. Cooper pursuant to the cap on noneconomic damages in CJ §11-108. The court declined to include the State in the judgment against Sgt. Cooper because the waiver of the State's sovereign immunity in the MTCA does not extend to actions or omissions that are grossly negligent.

In this appeal, Petitioners seek to avoid the application of the caps in the MTCA and CJ §11-108, as well as the doctrine of sovereign immunity, making a number of creative arguments. We agree with the Circuit Court and the Court of Special Appeals that those arguments are without merit.

## I

### Background

Mr. Parker was murdered by a fellow inmate on February 2, 2005, while they were both on a prison transport bus destined for a maximum security State correctional facility in Baltimore City known as "Supermax." The circumstances of the murder were described

in detail in this Court's previous opinion in this case. *Cooper v. Rodriguez,* 443 Md. 680, 688-703 (2015). There is no need to repeat those facts here. Because the questions before us in this appeal relate to the post-trial decisions of the Circuit Court that affected the judgments rendered as a result of the jury verdict, we recount the procedural path of this case in some detail.

*Complaint*

In May 2006, the Petitioners filed this action in the Circuit Court for Baltimore City against the State, several officials of the Department of Public Safety and Correctional Services ("DPSCS"), and various correctional officers. Sgt. Cooper was one of the defendant correctional officers. The suit alleged claims under both State and federal law relating to Mr. Parker's murder.

*Removal and Return*

The defendants, all represented by the Attorney General's Office, removed the case to the United States District Court for the District of Maryland and sought dismissal of the suit. The federal court granted summary judgment in favor of the defendants on the federal claims and remanded the remaining State law claims to the Circuit Court – a decision affirmed by the United States Court of Appeals for the Fourth Circuit. *Parker v. Maryland*, 413 Fed. Appx. 634 (4th Cir. 2011).

*Jury Verdict*

The case was tried in the Circuit Court before a jury during October 11 – 24, 2011. During the trial, the Petitioners dismissed their claims against one DPSCS official and the Circuit Court dismissed the claims against two others on the basis of public official

3

immunity. The jury returned a verdict in favor of one of the correctional officers and verdicts in favor of the Petitioners against the State and the four remaining correctional officers. The jury found that three of the officers were negligent and that one – Sgt. Cooper – was grossly negligent. The jury also found that the correctional officers' negligence was a proximate cause of Mr. Parker's death. The jury awarded $10 million in noneconomic damages to the estate, $1 million in noneconomic damages to Mr. Parker's father, $7.5 million in noneconomic damages to Mr. Parker's mother, and $15,000 in funeral expenses.

*Post-Trial Motions*

The defendants filed various post-trial motions. In particular, the defendants asked the Circuit Court to enter judgment in their favor notwithstanding the verdict ("judgment NOV") and submitted two motions for remittitur of the jury's verdict. The motion for judgment NOV asked the court to enter judgment in favor of the correctional officers on the basis of common law public official immunity and statutory immunity under the MTCA. With respect to Sgt. Cooper in particular, that motion asked the court to strike the finding of gross negligence. One motion for remittitur asked the court to limit the damages award to be entered against the State as a result of the negligence verdict to the statutory cap – $200,000 – then established in the MTCA. The second motion for remittitur asked that, if the Circuit Court did not grant the motion for judgment NOV with respect to the finding of gross negligence against Sgt. Cooper, it apply the general cap on noneconomic damages set forth in CJ §11-108 to limit the judgment against Sgt. Cooper to $645,000.

In response to the defendants' post-trial motions, the Circuit Court struck the jury's finding that Sgt. Cooper had been grossly negligent. With respect to all of the correctional

4

officers, the Circuit Court held that they were immune from liability on the basis of public official immunity as well as the immunity provision of the MTCA. Accordingly, it entered judgment NOV as to each officer, struck the damages awards against the individual officers, and entered judgment against the State. In computing the amount of that judgment, the court ruled that there were three claimants for purposes of the judgment against the State and capped the compensatory damages owing to each claimant under the MTCA at $200,000. As a result of its various rulings, the court entered judgment against the State in a total amount of $600,000. The court did not rule on the second motion for remittitur based on CJ §11-108 as to the judgment against Sgt. Cooper, presumably because it had granted judgment NOV in favor of Sgt. Cooper and there was no judgment against which such a remittitur could be applied.

*The First Appeal*

The Petitioners and the State both appealed. The Court of Special Appeals held that there was sufficient evidence to support a finding of gross negligence as to Sgt. Cooper and, for that reason, Sgt. Cooper was not entitled to statutory immunity under the MTCA. *Rodriguez v. State*, 218 Md. App. 573, 598-615 (2014). It also held that common law public official immunity did not apply under the circumstances of the case. 218 Md. App. at 615-29. Accordingly, it reversed the judgment NOV that the Circuit Court had granted in Sgt. Cooper's favor. It remanded the case for entry of judgment against Sgt. Cooper "subject, however, to any rights of remittitur that may remain unaddressed by the trial court." *Id*. at 629 & n.8. The intermediate appellate court also held that the Circuit Court

5

had calculated the damage limitation under the MTCA incorrectly and held that the statute capped the cumulative judgment against the State at $200,000. *Id*. at 632-39.

Sgt. Cooper then filed another motion for remittitur in the Circuit Court, reiterating the contention made in the earlier motion that the cap on noneconomic damages set forth in CJ §11-108 applied to the verdict against him.[4] The Circuit Court stayed proceedings concerning the motion for remittitur while Sgt. Cooper sought further review in this Court of the intermediate appellate court's decision to reinstate the verdict against him. We granted Sgt. Cooper's request for a writ of *certiorari,* but affirmed the decision of the Court of Special Appeals, although on somewhat different reasoning. *Cooper v. Rodriguez*, 443 Md. 680 (2015).[5] The case then returned to the Circuit Court.

*Remand after First Appeal*

On remand, the Circuit Court granted Sgt. Cooper's motion for remittitur – the motion that had been stayed while the case was under consideration by this Court in the first appeal – and, based on CJ §11-108, reduced the award of noneconomic damages

---

[4] This motion for remittitur was also based on, among other things, the grounds that the jury's award of funeral expenses was not supported by the evidence, that the amount of the verdict "grossly exceed[ed]" full compensation of the Petitioners, and that noneconomic damages awarded were inordinately disproportionate to the economic damages awarded.

[5] The Court of Special Appeals had held that Sgt. Cooper was not entitled to public official immunity because he had a "special relationship" to the inmates in his custody. This Court clarified that "the special relationship exception is a limitation on the public duty doctrine, not common law official immunity[,]" but came to the same end result, holding that the jury's finding of gross negligence negated Sgt. Cooper's ability to assert that immunity. 443 Md. at 733.

against him to $645,000. After Petitioners filed a motion for reconsideration, the Circuit Court corrected the calculation of the remittitur as to Sgt. Cooper and entered judgment in the amount of $1,625,000.[6] The Circuit Court rejected Petitioners' request to include the State in that judgment.

The Circuit Court's order applying the remittitur initially indicated a judgment of $1,625,000 against "the defendants." In response to a defense motion under Maryland Rules 2-534 and 2-535, the Circuit Court revised its order to make it consistent with its ruling on the post-trial motions and clarified that the judgment was against "Mr. Cooper ONLY."[7]

---

[6] The defense agreed that the initial calculation under the statute had been erroneous. Section 11-108 limits awards of noneconomic damages in personal injury and wrongful death actions based on causes of action arising after October 1, 1994 to $500,000, adjusted by the addition of annual increments of $15,000 for causes of action arising in later years. CJ §11-108(b)(2). In the revised calculation, the Circuit Court added 10 increments of $15,000 to $500,000 with respect to the Petitioners' survivorship claim for a total of $650,000. As a result of an intervening Court of Special Appeals decision since Sgt. Cooper had originally filed the remittitur motion in 2011, the Circuit Court also determined that it should add a separate amount to the cap for the Petitioners' wrongful death claim and that the cap for that claim should be increased by 50% because there were more than two claimants. *See Goss v. Estate of Jennings*, 207 Md. App. 151, 173-74 (2012). Accordingly, the Circuit Court added $975,000 to the cap with respect to the wrongful death claim. When the separate amounts as to the two causes of action are added together, one arrives at a cap of $1,625,000. No issue has been raised as to the accuracy of the revised calculation and we express no opinion about it.

[7] By this time, the State had already paid the Petitioners the $200,000 judgment that had been entered against the State pursuant to the MTCA with respect to the finding of negligence by the other correctional officers.

*Second Appeal*

The Petitioners again appealed, challenging (1) the Circuit Court's application of CJ §11-108 to reduce the judgment against Sgt. Cooper and (2) the Circuit Court's rejection of their request to enter that judgment against the State as well as Sgt. Cooper. The Court of Special Appeals rejected Petitioners' contention that Sgt. Cooper had waived application of CJ §11-108 and held that the Circuit Court had correctly applied that statute in limiting the judgment against him. The intermediate appellate court also held that the Circuit Court had correctly declined to enter that judgment against the State because the State had not waived sovereign immunity under the circumstances of this case.

Petitioners then sought a writ of *certiorari* on the same two issues, which we granted.

## II

### Discussion

Petitioners seek to overturn two decisions of the Circuit Court: (1) its decision to grant a remittitur of the judgment against Sgt. Cooper pursuant to CJ §11-108; and (2) its rejection of their request that it hold the State liable for the judgment against Sgt. Cooper.

### A. *Standard of Review*

With respect to the first question, as indicated above, the Circuit Court capped the judgment against Sgt. Cooper under CJ §11-108 in response to a defense motion for a remittitur. It is often said that a trial court's decision to grant or deny a remittitur is discretionary with the trial court and is thus reviewed on appeal under an abuse of discretion standard. *E.g.*, *State v. Walker*, 230 Md. 133, 137 (1962). However, this

standard of review likely derives from the fact a motion for, or order of, remittitur generally relates to a trial court's evaluation of the amount of the jury's verdict in relation to the evidence the jury heard – that is, whether the verdict is "grossly excessive," or "shocks the conscience" of the trial judge.[8] *See, e.g., Conklin v. Schillinger*, 255 Md. 50, 69-70 (1969); *Safeway Trails, Inc. v. Smith*, 222 Md. 206, 223 (1960).

In this case, the issue is not the trial court's evaluation of the verdict in relation to the evidence, but rather its application of a statute to that verdict. The Circuit Court was not so much exercising discretion as applying the mandate of CJ §11-108 ("the court shall ... reduce …"). The Circuit Court's decision was based on a conclusion of law – *i.e.*, that CJ §11-108 applies to the judgment against Sgt. Cooper. We review a Circuit Court's decision on a question of law without deference – sometimes referred to as a *de novo* standard of review – rather than under an abuse of discretion standard of review.[9] That is what we shall do here.

---

[8] A remittitur classically refers to "[a]n order awarding a new trial, or a damages amount lower than that awarded by the jury, and requiring the plaintiff to choose between those alternatives." Black's Law Dictionary (9th ed. 2009) at 1409. It is employed by a trial court when the court believes that the jury's verdict is excessive in relation to the evidence presented at trial. *See* John A. Lynch & Richard W. Bourne, Modern Maryland Civil Procedure (3d ed. 2016) at §10.3(c).

[9] These two seemingly disparate standards of review are sometimes reconciled with the observation that it is an abuse of discretion for a court to base a decision on an incorrect legal standard. *See, e.g., Wilson-X v. Department of Human Resources,* 403 Md. 667, 675 (2008) ("trial judges do not have discretion to apply inappropriate legal standards, even when making decisions that are regarded as discretionary in nature"); *Ragland v. State*, 385 Md. 706, 726 (2005) (abuse of discretion for trial court to allow testimony under the legal standard for lay opinion testimony when it should have applied the legal standard for expert testimony).

The second question under review is whether the Circuit Court correctly declined to include the State in the judgment entered against Sgt. Cooper. Technically, that decision was the result of (1) the Circuit Court's denial of Petitioners' motion for reconsideration of the court's decision not to enter judgment against the State in excess of the $200,000 cap under the MTCA and (2) the Circuit Court's grant of a subsequent defense motion under Maryland Rules 2-534 and 2-535 to correct an apparent clerical error in an order resulting from that denial. Such decisions will not be reversed by an appellate court unless the trial court abused its discretion or committed an error of law. *See, e.g., Morton v. Schlotzhauer*, 449 Md. 217, 231-34 (2016).

In this case, it is evident from the Circuit Court's memorandum opinion on the Petitioners' motion for reconsideration that the court was of the view that it was legally constrained from granting a motion to include the State in the judgment against Sgt. Cooper. In particular, the Circuit Court held that the MTCA and other State law precluded it from entering judgment against the State in excess of $200,000. It is that legal decision that Petitioners are challenging.

The Court of Special Appeals agreed with the Circuit Court's resolution of the legal issues as to both questions before us. The bottom line as to both questions is that we will consider the legal conclusions reached by the Circuit Court (as well as the Court of Special Appeals) without deference to those courts.

10

**B.** *Whether the Circuit Court Properly Applied CJ §11-108 to Limit the Judgment*

Petitioners assert that the cap on noneconomic damages set forth in CJ §11-108 should not have been applied to the judgment against Sgt. Cooper in this case and offer three alternative rationales for that assertion:

(1) That, for various reasons, the statutory cap was waived;

(2) That the cap does not apply when a defendant is found to be grossly negligent;

(3) That the cap does not apply to the State or its employees.

Largely for the same reasons articulated by the Circuit Court and the Court of Special Appeals, we reject those arguments and hold that the Circuit Court appropriately applied the cap on noneconomic damages in CJ §11-108 to the judgment against Sgt. Cooper.

1. Waiver

Petitioners assert that Sgt. Cooper waived the application of CJ §11-108 because he did not press the Circuit Court for an "alternative" ruling when that court granted judgment NOV in his favor in 2011 and did not raise the cap during the previous appeal in this case.[10]

As an initial matter, it is not at all clear that a litigant has the ability to waive the cap on noneconomic damages established by CJ §11-108. Notably, the statute states that an award of noneconomic damages "may not exceed" the cap and directs that a trial court "shall reduce" an award in excess of the cap, without requiring any particular action by the party against whom the judgment is rendered. CJ §11-108(b), (d). In a prior case assessing

---

[10] Petitioners have apparently abandoned an argument made in the courts below that the application of CJ §11-108 was waived because it was not identified as an affirmative defense in the answer to the complaint.

11

the constitutionality of the statute, this Court observed that, when the General Assembly enacted CJ §11-108, it "abrogated any cause of action for noneconomic tort damages in excess of [the cap]; it removed the issue from the judicial arena." *Murphy v. Edmonds*, 325 Md. 342, 373 (1992). It seems unlikely that the General Assembly contemplated that the courts would re-introduce the issue into the judicial arena through the concept of a waiver by one of the litigants.

In any event, even if it were possible for a particular litigant to waive the statutory cap with respect to a judgment against that litigant, there is no basis for finding such a waiver in this case. As recounted above, the defense specifically relied on CJ §11-108 in the post-trial motion for remittitur with respect to the judgment against Sgt. Cooper – a motion made on the contingency that the Circuit Court would not grant a judgment NOV in favor of Sgt. Cooper. When the Circuit Court in fact granted judgment NOV in favor of Sgt. Cooper, there was no longer a judgment against him and no need to address the motion for remittitur as to a judgment that did not exist. Unsurprisingly, the Circuit Court did not do so. When the judgment NOV as to Sgt. Cooper was later reversed by the Court of Special Appeals, the intermediate appellate court alluded to the unresolved motion for remittitur,[11] the defense reiterated that motion in the Circuit Court, and the application of CJ §11-108 was appropriately addressed at that time.

---

[11] 218 Md. App. at 629 n.8 (observing that CJ §11-108 would potentially cap any judgment).

The defense was not required to insist that the Circuit Court render an advisory opinion – "a long forbidden practice"[12] – on the application of CJ §11-108 in the event that the judgment was reversed on appeal. Such a rule, if adopted, would result in litigants having to imagine every possible permutation of how the case might be resolved on appeal, before an appeal was even noted, and asking trial courts to render advisory opinions on the consequences of those various permutations. The trial courts have too much to do to be required to foretell and to react to possible future appellate court rulings.

Nor was there any obligation for the defense to raise the issue of the cap on noneconomic damages in defending the Circuit Court's judgment in the first appeal.[13] The Circuit Court had granted a judgment NOV with respect to the jury's verdict of gross negligence as to Sgt. Cooper and, pursuant to the MTCA, as to the money judgment against him and the other correctional officers. As a result, Sgt. Cooper had essentially prevailed in the Circuit Court, as there was no judgment entered against him – or any of the other correctional officers. There was no obligation for the defense to raise on appeal what was

---

[12] *State Center, LLC v. Lexington Charles Limited Partnership*, 438 Md. 451, 591 (2014) (internal quotation marks and citations omitted).

[13] Petitioners argue that, in defending the judgment of the Circuit Court, Sgt. Cooper was obligated to raise any alternative grounds that would support affirmance of that judgment, and therefore should have raised the statutory cap in CJ §11-108. The sole case that Petitioners cite for this proposition actually concerned the failure of a *losing* party in a trial court to press a motion for judgment in *its* favor. *See Mitchell v. Montgomery County*, 88 Md. App. 542, 560-61 (1991). Moreover, as the Circuit Court indicated in its December 2015 opinion, a short answer to this contention is that CJ §11-108 would not provide an alternative rationale for *affirming* the Circuit Court's judgment, but rather is a basis for limiting the effect of a *reversal* of that judgment.

13

an academic issue at that juncture. Indeed, Sgt. Cooper could not have done so, had he wanted to. A "basic rule of appellate jurisprudence" is that "[a] party may not appeal from a judgment wholly in its favor." *Bowen v. City of Annapolis*, 402 Md. 587, 618 (2007). A prevailing party in a trial court has no duty to raise issues in an appellate court. *Id.*

2. Application of the Cap in Cases of Gross Negligence

Starting from the premise that the cap in CJ §11-108 is not to be applied when a defendant acts "intentionally," the Petitioners contend that the jury's determination that Sgt. Cooper was grossly negligent was equivalent to a finding that he acted intentionally. As a result, they argue, the cap in CJ §11-108 does not apply in this case.

While there are a number of problems with this syllogism,[14] its major premise – that the cap does not apply to judgments based on intentional torts – does not survive scrutiny when the statute is construed according to the standard principles of statutory construction.

---

[14] For example, a finding that a person acted with gross negligence is not necessarily a finding that the person acted intentionally or committed an intentional tort. Even when the Legislature has excluded intentional torts from the purview of a statute, this Court has held that such an exclusion does not encompass gross negligence. *See Johnson v. Mountaire Farms*, 305 Md. 246, 253-55 (1986) (grossly negligent action did not come within explicit exception in worker's compensation statute relating to actions done with "deliberate intention").

Petitioners argue that a jury instruction given by the trial court defining "gross negligence" required the jury to find that Sgt. Cooper acted intentionally if it found that he was guilty of gross negligence. It suffices to say that the instruction stated, in the alternative, that "the defendant is guilty of gross negligence … only when that defendant inflicts injury intentionally **or is so utterly indifferent to the rights of others** that the defendant acts as if such rights did not exist." (emphasis added).

In any event, as this Court noted in the previous appeal in this case, "[i]t is undisputed that Cooper did not commit an intentional tort …." *Cooper v. Rodriguez*, 443 Md. at 714.

14

Under those principles, one looks first to the text of a statute, giving the text its ordinary meaning in context. The plain meaning of the text may be confirmed – or ambiguities in the text resolved – by an examination of the legislative history and a consideration of the consequences of alternative interpretations. The ultimate goal is to discern and implement the legislative purpose without reading into the statute what is not there and without reading out of the statute what is.

*The Statutory Text*

The initial problem with the Petitioners' contention that the statute does not apply to judgments based on "intentional" acts is that the contention lacks any basis in the text of the statute. The statute reads, in pertinent part:

> (a) (1) In this section the following words have the meanings indicated.
>
> (2) (i) "Noneconomic damages" means:
>
> 1. In an action for personal injury, pain, suffering, inconvenience, physical impairment, disfigurement, loss of consortium, or other nonpecuniary injury; and
>
> 2. In an action for wrongful death, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, care, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education, or other noneconomic damages authorized under Title 3, Subtitle 9 of this article.
>
> (ii) "Noneconomic damages" does not include punitive damages.
>
> (3) "Primary claimant" means a claimant in an action for the death of a person described under §3-904(d) of this article.
>
> (4) "Secondary claimant" means a claimant in an action for the death of a person described under §3-904(e) of this article.

(b) (1) In any action for damages for personal injury in which the cause of action arises on or after July 1, 1986, an award for noneconomic damages may not exceed $350,000.

(2) (i) Except as provided in paragraph (3)(ii) of this subsection, in any action for damages for personal injury or wrongful death in which the cause of action arises on or after October 1, 1994, an award for noneconomic damages may not exceed $500,000.

(ii) The limitation on noneconomic damages provided under subparagraph (i) of this paragraph shall increase by $15,000 on October 1 of each year beginning on October 1, 1995. The increased amount shall apply to causes of action arising between October 1 of that year and September 30 of the following year, inclusive.

(3) (i) The limitation established under paragraph (2) of this subsection shall apply in a personal injury action to each direct victim of tortious conduct and all persons who claim injury by or through that victim.

(ii) In a wrongful death action in which there are two or more claimants or beneficiaries, an award for noneconomic damages may not exceed 150% of the limitation established under paragraph (2) of this subsection, regardless of the number of claimants or beneficiaries who share in the award.

\* \* \*

(d) (1) In a jury trial, the jury may not be informed of the limitation established under subsection (b) of this section.

(2) (i) If the jury awards an amount for noneconomic damages that exceeds the limitation established under subsection (b) of this section, the court shall reduce the amount to conform to the limitation.

(ii) In a wrongful death action in which there are two or more claimants or beneficiaries, if the jury awards an amount for noneconomic damages that exceeds the limitation established under subsection (b)(3)(ii) of this section the court shall:

16

1.  If the amount of noneconomic damages for the primary claimants equals or exceeds the limitation under subsection (b)(3)(ii) of this section:

A.  Reduce each individual award of a primary claimant proportionately to the total award of all of the primary claimants so that the total award to all claimants or beneficiaries conforms to the limitation; and

B.  Reduce each award, if any, to a secondary claimant to zero dollars; or

2.  If the amount of noneconomic damages for the primary claimants does not exceed the limitation under subsection (b)(3)(ii) of this section or if there is no award to a primary claimant:

A.  Enter an award to the primary claimant, if any, as directed by the verdict; and

B.  Reduce each individual award of a secondary claimant proportionately to the total award of all of the secondary claimants so that the total award to all claimants or beneficiaries conforms to the limitation.

\*　　\*　　\*

CJ §11-108.

As is evident, the statutory text pertinent to this case states that the cap applies "[i]n *any* action for damages for personal injury or wrongful death." CJ §11-108(b)(2)(ii) (emphasis added). Nothing in the language quoted above limits the purview of the statute with respect to judgments arising from intentional actions or gross negligence. Under the oft-stated principles of statutory construction, that could be not only the beginning, but also the end, of the analysis. *E.g., Bellard v. State*, 452 Md. 467, 481-82 (2017) (summarizing the principles of statutory construction, including that "[w]hen the statutory language is clear, we need not look beyond the statutory language…"). Despite the statutory text, Petitioners would read an intentional tort exclusion into the statute based on its legislative

history, as seen through a 1996 decision of the Court of Special Appeals. However, that decision has never been embraced by this Court and, in our view, reads too much into the statute. Moreover, the legislative history of the statute is silent as to an intentional tort exclusion.

*The Case of* Cole v. Sullivan

To avoid the plain language of the statute, Petitioners rely on the Court of Special Appeals decision in *Cole v. Sullivan,* 110 Md. App. 79 (1996). That case arose out of the disposition of a decedent's estate disrupted by a family dispute that had spiraled out of control. A jury found that the defendants were liable for false imprisonment of the plaintiffs,[15] among other things, and the question arose whether the jury's award of noneconomic damages was capped by CJ §11-108.

On appeal, the Court of Special Appeals held that the cap did not apply to judgments based on intentional torts. While acknowledging that the phrase "damages for personal injury" could well apply to damages arising out of an intentional tort, the intermediate appellate court looked to the legislative history of a 1994 amendment of the statute to fashion an exclusion for intentional torts. The 1994 amendment abrogated a prior decision of this Court[16] and explicitly extended the statute to cap judgments in wrongful death

---

[15] In *Cole* there was thus no question that the judgment was based on an intentional tort – unlike this case. *See* footnote 14 above.

[16] *United States v. Streidel*, 329 Md. 533 (1993).

18

actions. That decision, as well as an earlier case,[17] had noted that the statute had originally been enacted out of a concern about rising medical malpractice insurance premiums. The *Cole* court conceded that a personal injury action could be based on an intentional tort and that judgments relating to both "intentional and non-intentional torts" may affect liability insurance rates.[18] However, the court observed that many insurance policies exclude coverage for intentional torts and thus an exclusion of judgments for intentional torts from the cap should not materially affect liability insurance rates. While the court thus identified a possible policy basis for excluding intentional torts form the purview of the statute, it never tied its reasoning to any particular language in the statute.

As best we can tell from our research, this Court has never adopted the holding or rationale of *Cole,* and has not even cited the case, except for an unrelated matter concerning trial procedure on claims for punitive damages.[19] Our own review of the legislative history of the statute confirms what is evident in the discussion of it in *Cole* – there is no reference to an exclusion of actions involving intentional torts with respect to any of the bills that resulted in what is now CJ §11-108.

*The Legislative History*

CJ §11-108 was originally enacted in 1986. Chapter 639, Laws of Maryland 1986. It is evident from the bill file for Senate Bill 558 (1986) that those promoting the bill were

---

[17] *Murphy v. Edmonds*, 325 Md. 342, 369 (1992).

[18] 110 Md. App. at 91-93.

[19] *See Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 274-75 (2004).

focused on a perceived crisis arising from excessive verdicts in medical malpractice cases that threatened to disrupt the market for medical malpractice insurance. Two task forces, commissioned by the executive and legislative branches to study liability insurance and medical malpractice insurance respectively, had both recommended enactment of a cap on tort damages. *See Murphy v. Edmonds*, 325 Md. 342, 368-70 (1992) (recounting history of 1986 bill). In assessing a later constitutional challenge to the cap on noneconomic damages, this Court pointed to the desire to stabilize the liability insurance market as a rational basis for the law that defeated a challenge to that statute under the equal protection clause. *Id*. at 369.

Several compromises were apparently made concerning the breadth of the 1986 legislation as it moved through the Legislature. The bill as originally drafted would have covered all tort judgments arising from actions for personal injury. Senate Bill 558 (1986), first reader. It was amended in the Senate to limit its purview to medical malpractice claims, presumably because the perceived crisis in the medical malpractice insurance market was the driving force for the bill. In particular, the bill would apply only to a judgment in an action "arising out of the rendering of or failure to render professional services by a health care provider." Senate Journal (1986) at 1317-20, 1388-91.[20]

---

[20] As this Court has previously recognized, what is commonly referred to as a medical malpractice claim may take the form of a variety of different causes of action, some of which are based on intentional conduct:

> These actions, often bearing the common appellation of "malpractice," differ in their underlying theory, in some of the elements that must be proved, and in the kind of damages that may be recovered. Most are tort-based, sounding either in battery or in negligence of one kind or another,

However, the House of Delegates adopted a broader version of the bill that was rejected by the Senate. House Journal (1986) at 2884-86, 2920-21; Senate Journal (1986) at 2845-47. The bill went to a conference committee that recommended amendments ultimately adopted by both houses. Pertinent to this case, those amendments deleted the limitation to medical malpractice actions and substituted "any action for damages for personal injury." Senate Journal (1986) at 3275-81; House Journal (1986) at 3420-24. Thus, as ultimately enacted in 1986, the bill – and its cap on noneconomic damages – applied broadly to "any action for personal injury" – a change that strengthened the argument in favor of its constitutionality. *See* Bill Review Letter of Attorney General Stephen H. Sachs to Governor Harry Hughes concerning Senate Bill 558 (May 6, 1986) at p. 2.

The next amendment of the statute relevant to this case occurred in 1994 when the General Assembly expanded its reach to wrongful death actions, such as the wrongful death action in this case.[21] Chapter 477, Laws of Maryland 1994. There is no indication in the

and occasionally, misrepresentation or fraud; some are contract-based. When they are pursued either alternatively or in combination, care must be taken to keep the actions separate and not to allow the theories, elements, and recoverable damages to become improperly intertwined.

*Dingle v. Belin*, 358 Md. 354, 367 (2000). Like the statutory text, the legislative history of CJ §11-108 does not make fine distinctions among the causes of action that might make up a medical malpractice or personal injury action.

[21] In the interim, the Legislature had amended the statute so that, in a jury trial, the jury may not be informed of the statutory cap on noneconomic damages. Chapter 629, Laws of Maryland 1989; *see* CJ §11-108(d)(1). This was in reaction to a federal court decision that had concluded that a jury *should* be told about the statutory cap on noneconomic damages. *See Franklin v. Mazda Motor Corp.*, 704 F. Supp. 1325, 1328-29 (D.Md. 1989).

legislative history of that amendment that the operation of the cap would be affected by the degree of intent underlying the defendant's actions in such a case.[22] Subsequent amendments of the statute are not relevant to the issues before us in this case.[23]

The legislative history of the statute thus reveals that a key object of the legislation was to stabilize the liability insurance market, especially with respect to medical malpractice liability. But that legislative history does not indicate an intention to exclude judgments based on claims arising from intentional or grossly negligent conduct and we decline to insert a qualification in the statute that the Legislature did not include in the text. *See Bellard*, 452 Md. at 481 ("we neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words that the General Assembly used") (citation omitted).

*Summary*

Nothing in the language of CJ §11-108 limits its purview to negligence actions, excludes actions involving intentional torts, or makes insurability of the injury a prerequisite for application of the statute. The plain language of the statute establishes limits on an award of noneconomic damages (as defined in the statute) in "*any* action for

---

[22] By definition, a wrongful death action may be based upon "an act, neglect, or default, including a felonious act" and is not limited to negligent acts. CJ §3-901(e) (definition of "wrongful act").

[23] Aside from minor changes made in annual corrective bills, the statute was amended in 1997 to modify the computation of the cap with respect to wrongful death actions and in 2004 to carve out a separate statute for the cap in medical malpractice cases. Chapter 318, Laws of Maryland 1997; Chapter 5, §1, Special Session, Laws of Maryland 2004.

damages for personal injury" arising after July 1, 1986 and in "*any* action for … wrongful death" arising after October 1, 1994. CJ §11-108(b)(1), (b)(2) (emphasis added). The definition of "noneconomic damages" in the statute does not limit the types of damages only to those recoverable in a negligence action.

3. Application of the Cap When a State Employee is a Defendant

Petitioners argue that the cap on noneconomic damages in CJ §11-108 should not be applied to judgments against the State or its employees. Again, the plain language of the statute does not state such an exclusion. Nor, so far as we can determine, has any court read such a limitation into the statute.[24]

Petitioners rely primarily on the legislative history – or, more precisely, what they assert is absent from the legislative history of CJ §11-108. In particular, they observe that the Department of Legislative Services typically prepares a fiscal note estimating the impact on State finances of particular bills. They argue that the fact that the fiscal note for the bill that originally enacted CJ §11-108 did not estimate any impact from the bill on State entities – *i.e.*, a potential reduction in future State liability – means that the State and its employees were excluded from the purview of the bill, even though nothing in the bill, or the legislative materials, refers to such an exclusion.

---

[24] Petitioners point out that there is no reported appellate decision applying the cap in CJ §11-108 to a judgment in a personal injury or wrongful death case against the State or a State employee. This seems unremarkable as the MTCA generally caps judgments against the State at an amount lower than CJ §11-108 would and State employees enjoy complete immunity under the MTCA in the vast majority of such cases.

The absence of a specific mention that the State or State employees would be covered – or that the bill would have an effect on State finances – is unsurprising. Judgments against the State relating to personal injury claims were already limited under the MTCA, which also provided immunity for State employees for the vast majority of such claims. To the extent that a State employee – not a State agency – would potentially face personal liability for a judgment based on an intentional tort or gross negligence, that liability would not have an impact on State finances that the fiscal note was designed to estimate. Nothing in the legislative history suggests that the General Assembly intended to single out State employees for exclusion from CJ §11-108.[25]

## C.    *Whether Judgment Should Have Been Entered Against the State*

Petitioners contend that the Circuit Court should have included the State in the judgment that it entered against Sgt. Cooper. There are at least two hurdles that must be surmounted for such a result – sovereign immunity and, to the extent the Legislature has waived that immunity for a tort action under the MTCA, the statutory limits on that waiver. Petitioners attempt to leap those hurdles by arguing that Sgt. Cooper was ill-served by his representation by the same counsel that represented his co-defendants and that the remedy for the alleged conflict requires a waiver of sovereign immunity for their benefit. To assess this argument requires a brief detour to discuss the relationship of the MTCA to sovereign

---

[25] It is not at all clear what policy basis would exist for singling out one category of individuals – State employees – for uncapped personal liability, much less doing so silently in the statute and the legislative history.

immunity and the statutes that authorize representation of State personnel by the Attorney General.

1. Sovereign Immunity and the MTCA in this Case

Sovereign immunity bars actions against the State for money damages. *Condon v. State*, 332 Md. 481, 492 (1993). The decision whether to waive or alter the application of sovereign immunity, including conditions for the defense and indemnification of employees, "is entirely within the prerogative of the General Assembly." *Rios v. Montgomery County*, 386 Md. 104, 140 (2005) (citations and quotation marks omitted). In the absence of a waiver of sovereign immunity by the General Assembly, a person injured by an action or omission of a State employee would have no recourse against the State itself. To provide compensation for such persons, the Legislature has waived sovereign immunity to a certain degree in the MTCA.

Under the MTCA, a party injured by the negligent act or omission of a State officer or employee within the scope of the officer's or employee's public duties may obtain compensation for that injury from the State in lieu of seeking recovery from State personnel. For that purpose, the General Assembly has enacted a limited waiver of the State's sovereign immunity and provided immunity for the State personnel whose negligence is the basis for the particular action. *See* SG §§12-104, 12-105; CJ §5-522. In

effect, the MTCA substitutes the State for the State personnel as the appropriate defendant in such an action.[26] *See Cooper v. Rodriguez,* 443 Md. at 706-08.

The State's waiver of sovereign immunity in the MTCA is limited in several respects, two of which are particularly relevant to this case: (1) the waiver of sovereign immunity is not effective if the State personnel acted with malice or gross negligence; and (2) the State's liability cannot exceed $200,000 to a single claimant for injuries from a single incident or occurrence.[27] SG §12-104. A plaintiff must also satisfy certain procedural requirements, not at issue in this case. *See* SG §12-106 *et seq*.

As noted above, the Circuit Court ultimately entered a judgment against the State in the amount of $200,000 – the maximum amount permitted by the MTCA – with respect to the jury's verdict that the correctional officers (other than Sgt. Cooper) were negligent. The jury's finding that Sgt. Cooper had been grossly negligent meant that there was no waiver of the State's sovereign immunity under the MTCA as to his actions. Nor did Sgt. Cooper enjoy the immunity from liability that the MTCA provides for State personnel who are merely negligent. Accordingly, the Circuit Court entered the full amount of the jury's verdict, as capped by CJ §11-108, against Sgt. Cooper.

---

[26] This is not to say that the State personnel would otherwise be liable if the MTCA did not exist. Common law official immunities might also apply in the particular case. *See Cooper v. Rodriguez*, 443 Md. at 713-14.

[27] That limitation has been raised to $400,000 for causes of action arising on or after October 1, 2015. Chapter 132, Laws of Maryland 2015.

To avoid this straightforward application of sovereign immunity and the MTCA to this case, Petitioners contend that the Circuit Court should have found that the State waived sovereign immunity beyond the cap set by MTCA. According to Petitioners, the Circuit Court could have found justification for such a deviation from the governing law in the fact that the State provided legal representation for Sgt. Cooper in the case and, in Petitioners' view, the attorneys who provided such representation labored under a conflict because they also represented the State. The remedy for that conflict, according to Petitioners, would be for the Circuit Court to include the State in the judgment against Sgt. Cooper.

To provide some context for assessing this argument, we briefly review the law governing representation of State employees by the Attorney General and the law providing for payment, in some circumstances, of judgments against State employees by the State.

2. Representation of State Personnel Pursuant to State Law

The Attorney General is the legal adviser to the State and its agencies and normally represents them in litigation concerning State activities. Maryland Constitution, Article V, §3(a)(2); Maryland Code, State Government Article ("SG"), §6-106. The General Assembly has also provided for representation of State officers and employees by the Attorney General when they are sued in their personal capacities for actions taken in the course of their public employment.[28] SG §12-301 *et seq.* To obtain such representation,

---

[28] This is similar in many respects to the representation provided to federal officers and employees by the United States Department of Justice with respect to actions taken in the course of federal employment. *See* 28 CFR §50.15(a).

27

the employee must submit a written request for representation.  SG §12-304(a)(1)(ii).  The

Attorney General then must conduct an investigation and determine whether the employee

is eligible for representation.  SG §12-304(a)(1)(iii)-(iv).  An employee is not eligible for

such representation if the Attorney General determines that the employee was not acting

within the scope of employment or if the act was "malicious" or "grossly negligent."  SG

§12-304(b)(1).  The General Assembly has conferred "sole discretion" on the Attorney

General to determine whether to provide representation to an employee.  SG §12-304(c).

A State employee also retains the right to retain the employee's own counsel at his or her

own expense.  SG §12-304(d)(1).

If the Attorney General determines that the employee is eligible and undertakes to

provide representation, the Attorney General and the employee are then to enter into an

agreement.  SG §12-304(a)(1)(v).  That agreement is to state explicitly that the State is not

responsible for payment of a judgment against the employee and that legal representation

of the employee does not mean that the State will pay such a judgment or a settlement of a

claim.[29]  SG §12-305(3)(i)-(ii).  The agreement is to advise the employee that he or she

may apply to the Board of Public Works for payment of such a judgment or settlement

against the employee.  SG §12-305(3)(iii).[30]  The agreement is also to advise the employee

that, if it is judicially determined that immunity is not available to the employee, that the

---

[29] The statute provides that a claim may be settled only with the written consent of the employee.  However, if the employee refuses to consent to a proposed settlement, the Attorney General may withdraw from representing the employee.  SG §12-305(4).

[30] See also Part II.D.3 of this opinion below.

28

injuries arose out of an act or omission of the employee, and that the employee was not acting within the scope of employment or acted maliciously or with gross negligence, the Attorney General may seek reimbursement of attorney's fees and other costs from the employee. SG §12-305(1)-(2).[31]

The Legislature has explicitly provided that representation by the Attorney General does not deprive "any" State officer, employee, or unit of sovereign immunity. SG §12-306(b).

3. Payment of Judgments Entered Against State Personnel

The General Assembly has provided for the State to pay judgments (as well as settlements) against a State employee under particular circumstances. SG §12-401 *et seq*. Any such payment must be approved by the Board of Public Works – a body established by the State Constitution consisting of the Governor, Comptroller, and Treasurer. SG §12-501; Maryland Constitution, Article XII. The employee must submit an application to the Board of Public Works providing certain information concerning the judgment. SG §12-405(b)(1). The Attorney General is to provide a report and recommendation to the Board of Public Works, if the employee was represented by the Attorney General. SG §12-405(b)(4). Following the submission of the application, provision of the Attorney General's report and recommendation, and any hearing in the matter, the Board of Public

---

[31] If the Attorney General declines to represent a State employee, the employee may still be protected by sovereign immunity if a court or jury makes certain findings. SG §12-308. In that instance, the State employee may be reimbursed by the State for attorney's fees, court costs and other reasonable expenses. SG §12-310.

Works may approve payment of the judgment if it finds that the act or omission was within the scope of employment of the employee and was not malicious or grossly negligent. SG §12-405(b)(6).

The General Assembly has delegated to the Board of Public Works the authority to pay judgments and settlements. SG §12-501(a). The Board of Public Works' decision to pay – or not to pay – a particular judgment is not subject to judicial review. SG §12-501(a)(5). Nor is a decision to pay a judgment to be construed as a waiver of the State's sovereign immunity. SG §12-501(a)(6).

4. The Representation of Sgt. Cooper in this Case

In this case, it is apparently undisputed the Attorney General represented the individual correctional officers, as well as the State, in accordance with the statutes outlined above. With respect to Sgt. Cooper, the Attorney General entered into the requisite written agreement with Sgt. Cooper concerning that representation.[32] That agreement essentially

---

[32] It appears that, shortly after Petitioners' complaint was filed in the Circuit Court, it was Petitioners' counsel who suggested to Sgt. Cooper that he could obtain representation from the Attorney General's Office, while appropriately noting that Sgt. Cooper could also consult private counsel. An affidavit provided by one of the Assistant Attorneys General assigned to the case indicated that the requisite standard representation agreement was entered with Sgt. Cooper sometime in 2007 at the outset of the case. The original agreement was apparently lost and Sgt. Cooper signed a duplicate version on December 17, 2015, the morning of a hearing before the Circuit Court. The duplicate version was submitted to that court in connection with the hearing on Sgt. Cooper's motion for remittitur. While this may not have been the best way in which to establish the terms of the representation agreement, nothing in the record contradicts the sworn affidavit that a written agreement satisfying the statutory requirements was originally executed at the outset of the case. Moreover, even if there had been no written agreement, nothing in the statute suggests that the State's sovereign immunity would be waived.

tracked the provisions of SG §12-301 *et seq.* In particular, as required by statute, the agreement provided that, if a judgment were rendered against Sgt. Cooper in the case, the State would not be responsible for payment of the judgment and that the representation provided by the Attorney General did not signify otherwise.

All of the defendants, including Sgt. Cooper, were represented by the Attorney General's Office at the trial. Although the jury returned a verdict that Sgt. Cooper was grossly negligent, those attorneys persuaded the Circuit Court to overrule the jury's finding and grant judgment NOV in his favor, effectively transferring liability for simple negligence to the State pursuant to the MTCA. As indicated earlier, that ruling was reversed on appeal. However, in its opinion in this case, the Circuit Court acknowledged the "vigorous representation" of Sgt. Cooper by those attorneys in the trial court.

5.    Analysis

Petitioners argue that the issue of whether Sgt. Cooper had been grossly negligent created a conflict that precluded representation by the Attorney General. It is true, as Petitioners note, that DPSCS decided to terminate Sgt. Cooper's employment as a result of the incident that resulted in Mr. Parker's death and that the written termination decision stated that Sgt. Cooper had been grossly negligent. However, in responding to Sgt. Cooper's request for representation in this litigation, the Attorney General was obligated to conduct its own investigation (SG §12-304(b)(1)), and was not bound by the agency's determination on the question of gross negligence (SG §12-304(c)).[33]

---

[33] Although Petitioners appear to argue that Sgt. Cooper's attorneys labored under a conflict from the outset of the case, they did not raise the issue of a conflict until the

Petitioners argue that Sgt. Cooper's counsel had an incentive to "transfer millions in liability" from one client (*i.e.,* the State) to another (*i.e.,* Sgt. Cooper). This argument, at best, reflects a misunderstanding of the application of the MTCA to the circumstances of this case. Had a hypothetical separate counsel for Sgt. Cooper obtained a better result for him at trial or on appeal, no liability would have shifted to the State. For example, if a jury verdict had been returned completely in Sgt. Cooper's favor, the State would have incurred no additional liability as a result of his actions. If the hypothetical separate counsel had been able to limit the jury verdict against Sgt. Cooper to simple negligence or had been able to maintain the judgment NOV in his favor on appeal, the State would have incurred no additional liability beyond the $200,000 judgment it incurred with respect to the negligence of the other officers. There was no "incentive" for the attorneys representing Sgt. Cooper to "shift" liability from the State to him.

In any event, Petitioners were not a party to this attorney-client relationship. Even if they somehow had standing to raise the question of a conflict in the representation of an adverse party, they have not identified how they were harmed by the alleged conflict. As noted above, a hypothetical separate counsel who obtained a better result for Sgt. Cooper at trial or on appeal would presumably have reduced or eliminated the judgment against Sgt. Cooper and there would have been no increase in the judgment against the State.[34]

---

defense filed motions for remittitur of the jury verdict on behalf of Sgt. Cooper and the State – five years into the litigation.

[34] It perhaps goes without saying that, to the extent that Petitioners' argument is premised on the notion that Sgt. Cooper should not have been found grossly negligent at

32

Whatever claim or complaint Sgt. Cooper may have as to the State or the attorneys who represented him in this action, it is a leap beyond logic to say that the remedy for such a claim would be to enter judgment in favor of a third party who is adverse to both Sgt. Cooper and the State.[35]  As the Seventh Circuit once remarked, "[w]e doubt in any event that the rules regarding representation by the government of its employees are intended for the protection of opposing litigants." *Brontkowski v. Smith*, 305 F.3d 757, 760 (7th Cir. 2002) (Posner, J.) (holding that plaintiff accusing government employee of wrongdoing was not entitled to an order barring government attorneys from representing that employee).

Petitioners cite no legal authority for the remedy they seek.  They rely on brief snippets from oral arguments in two cases under the Local Government Tort Claims Act.[36]  Those cases involved a different statutory scheme that does not involve the statutes authorizing representation of State personnel by the Attorney General.  Moreover,

---

the trial, that is precisely the opposite of what they argued at trial and in the first appeal of this case.

[35] At oral argument, Petitioners' counsel was questioned as to how a separate counsel for Sgt. Cooper might have litigated his defense differently.  Petitioners' counsel stated that a separate counsel for Sgt. Cooper might have conceded that Sgt. Cooper was negligent, but opposed a finding of gross negligence – which, if successful, would have ultimately resulted in the same $200,000 judgment against the State and no judgment against Sgt. Cooper.  Petitioners' counsel was unable to explain how his clients would have been better off from such a result.

[36] Maryland Code, Courts & Judicial Proceedings Article, §5-301 *et seq*.

Petitioners point to no ruling or holding in either of those cases – or any other Maryland case, for that matter – that supports their position in this case.[37]

In essence, Petitioners are asking this Court to assume the responsibilities of the Attorney General – *i.e.*, to recommend to the Board of Public Works whether to indemnify a State employee – and of the Board of Public Works itself – *i.e.*, to decide whether to do so. Those are decisions that the General Assembly, in determining when to waive or alter the State's sovereign immunity, has delegated by statute to those constitutional officers. Neither the State constitution nor those statutes authorize this Court to devise a different approach desired by Petitioners.

### III

### Conclusion

For the reasons explained above, we hold:

(1)     The statutory cap on judgments for noneconomic damages in personal injury and wrongful death actions applies to judgments against the State or State personnel, if the

---

[37] Petitioners also cite two out-of-state cases that construe statutes in those states relating to indemnification of public employees. *See Los Angeles Police Protective League v. City of Los Angeles*, 32 Cal. Rptr. 2d 574 (Cal.App. 1994) (holding that public entity was not required, under either California Tort Claims Act or separate labor statute, to indemnify police officers for attorney's fees expended in successfully defending criminal charges); *Pinshaw v. Metropolitan District Comm'n*, 524 N.E. 2d 1351 (Mass. 1988) (construing Massachusetts statute requiring state to indemnify police officers up to a statutory cap for judgments relating to intentional torts and civil rights violations and suggesting that state follow a statutory procedure to obtain separate counsel for an officer if the right to indemnification will be contested in a particular case). Neither case holds – or even suggests – that a purported conflict in representation would waive a state's sovereign immunity.

judgment otherwise exceeds that cap. The cap applies even if the State personnel are found to have acted with gross negligence. Even if it is possible for a defendant to waive the operation of the statute, no waiver occurred in this case.

(2)     The State does not waive sovereign immunity as to a tort claim by providing legal representation to State personnel alleged to have committed that tort within the scope of State employment. Even if joint representation of the State and State personnel could be found to be a conflict of interest under the ethical rules relating to attorneys, that conflict would not constitute a waiver of sovereign immunity as to a third party.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

35